297 So.2d 622 (1974)
Eugene B. PORTER, Appellant,
v.
LORENE INVESTMENT COMPANY, a Corporation under the Laws of Florida, Appellee.
No. T-259.
District Court of Appeal of Florida, First District.
June 25, 1974.
Rehearing Denied August 7, 1974.
Jackson Bryan of Bryan & Middleton, Palatka, for appellant.
J. Robert McClure, Jr., and John Ronald Storey of McClure & Wigginton, Tallahassee, and Joe C. Miller, II, Palatka, for appellee.
*623 RAWLS, Chief Judge.
Appellant-Porter is before this Court challenging a final judgment quieting, in Appellee-Lorene Investment Co., title to approximately 750 acres of land located in Putnam County, Florida. The pertinent point posed by Porter is whether Lorene Investment Co. had prior to 1939 obtained title to the land in question by adverse possession without color of title.
The parties are in agreement that sometime prior to 1920 P.D. Watkins, a land surveyor, conveyed to Angus Alderman record title to land which is contiguous to the approximately 750-acre disputed tract. At the time of the conveyance Angus and Watkins walked the land with Watkins pointing out the boundaries. The boundaries which were pointed out to Angus by Watkins included the land in dispute. Angus then went to Palatka to Tillman's Hardware Store, purchased five miles of fence wire and proceeded to erect a hog fence along the boundaries pointed out to him by Watkins.[1] This fencing resulted in the disputed area being completely enclosed.[2] Angus kept cows, hogs and horses on the property and grew crops of corn, peanuts and chufa. He also built a cattle dipping vat on the subject property.
In 1929, Angus conveyed to B.J. Alderman his good record title to the land adjacent to the disputed tract. At the time of the conveyance B.J. and Angus walked the fenceline with Angus telling B.J. that the fenceline was the boundary of the property. B.J. testified that in 1929 the disputed land was fenced with a fence sufficient to turn hogs and cows and that crops of corn and peanuts were growing on the land. After the purchase, B.J. placed his hogs and cows on the disputed tract. From 1932 until his death[3] B.J. lived within a mile of the disputed property and visited it every day or so. He testified that he was the only person in possession and that no one challenged his right of possession.
From the early 20's to the 1930's, Warren Brantly and C.C. Watkins, two "old timers" to the area, 'coon hunted on the land. They testified that they only hunted on the land with the permission of either Angus or B.J. Alderman. Watkins remembered that in the summer of 1929 Angus had planted fields of either peanuts or chufa. Brantly recalled that in 1927 the land was enclosed with a full height, American wire fence with one or two strands of barbed wire. As to more recent times, Mr. Sapps, B.J. Alderman's foreman from 1956 to 1969, testified that his duties were to round up B.J.'s cattle which were located on the disputed tract, repair fences and keep out trespassers. According to Sapps, from 1956 to 1969 the fence was in good order and would turn cattle. B.J. had cattle on the land and there were two chufa pastures under cultivation, and the land was posted.
From 1920 to the present, Porter testified that he or his father and mother had record title to the land,[4] and had returned *624 the land for taxes.[5] During this fifty-year period, Eugene's father had once gone onto the land to obtain a peat sample. Eugene stated that since about 1935 he had visited the land several times and admitted that during at least some of these visits he had observed cattle on the land.
The first matter which must be decided is, for purposes of adverse possession, who had possession of the disputed land. The possession requires that it be open, actual, continuous and hostile.[6] From before 1920 until the present time, Lorene's predecessors in title actually used the land for raising peanuts and chufa and for grazing cattle and hogs. Their possession was open for it was known and recognized by various members of the community and was even observed by the Porter family. The possession was hostile in that it was contrary to the rights of ownership of the Porters and all the world. In contrast, the Porters' use of the land for some 50 years was no greater than that of a casual visitor or trespasser. The trial judge correctly found that possession of the disputed tract during all applicable times was clearly under the control of Lorene Investment Co. and its predecessors in title.
The facts present a clear picture for determination of ownership of the parcel on the basis of adverse possession without color of title. From 1924, possession of the land was under the control of Lorene Investment Co. and its predecessors in title while record title was vested in the Porters who returned the land for taxes. The pertinent time for determining the ownership of the disputed parcel commences when Lorene's predecessor in title, Angus Alderman, reduced the disputed land to his possession and control. The record reveals that this was done, at the latest, between 1920 and 1923 when Angus completely enclosed the land with a fence.[7] Then in effect Section 2936(1) of the Revised General Statutes of Florida set forth the requirements of adverse possession without color of title as being a continuous occupancy for seven years.[8] The required occupancy is defined in Section 2936(2) of the Revised General Statutes of Florida, 1920, as substantially enclosing the land or cultivating or improving the land.[9] The facts clearly show that sometime between 1920 and 1923 Lorene's predecessor in title, Angus Alderman, commenced meeting the requirements for obtaining title to the land by adverse possession without color of title when he substantially enclosed the disputed land with a fence. In addition, he cultivated a part of the land. The applicable laws also required that the occupancy be continuous for seven years. Angus held the land until 1929 when he turned possession over to B.J. Alderman who held the land until the late 60's when he deeded it to Lorene Investment Co. Both men testified that their possession and occupancy was to the exclusion of all others and continuous. Members of the community verified this. The statutory provision of seven continuous years of occupancy was met at the latest date in 1930. At *625 that juncture, title to the land vested in the adverse possessor who was Lorene's predecessor in title.[10]
In 1939, Section 2936 of the Revised General Statutes of Florida was amended by the legislature to require that in addition to the occupancy of the land for seven continuous years that an adverse possessor must return the land for taxes.[11] This amendment is not applicable for Lorene's predecessor in title had some nine years before gotten title to the land and was no longer an adverse possessor.[12]
Last, for purposes of clarity, we note that our Supreme Court's recent decision in Meyer v. Law, 287 So.2d 37 (1973), is not applicable to this case. The Meyer decision, supra, held that good record title to land contiguous to the disputed parcel did not, for the purposes of adverse possession, constitute color of title to the disputed land thus dispensing with the necessity of returning the disputed parcel for taxes even though both the contiguous land and the disputed parcel were enclosed by a common fence and occupied by the owner of the contiguous land.
Even though the parties agree that Lorene Investment Co. and its predecessors in title have good record title to land contiguous to the disputed tract, the decision of the trial court and this Court is not concerned with that fact. This Court's decision is based solely on the fact that title is vested in Lorene Investment Co., as prior to 1939 Lorene's predecessors in title complied with the then applicable statutes governing adverse possession without color of title.
The judgment appealed is affirmed.
JOHNSON and McCORD, JJ., concur.
NOTES
[1] Angus testified that not more than three years elapsed between the conveyance and his fencing the property. One witness testified that in 1920 the land was fenced with a fence which was sufficient to turn cattle.
[2] The disputed area includes several small lakes and canals. The fencing was used in conjunction with the lakes and canals for the purposes of turning cows.
[3] B.J. Alderman died during the pendency of this litigation on March 31, 1970.
[4] It is not contended that aside from Lorene Investment Co.'s claim Porter's title is marketable. The record indicates that the Porters had been aware for some time that record title problems existed. The family has initiated at least two quiet title actions which cover a part of the land, and the 1961 state appraisal for the estate of Eugene Porter's father for Federal and State tax purposes notes that the property is returned only at a nominal value as serious clouds exist rendering the title non-marketable. This evaluation was accepted by the Internal Revenue Service after an audit.
[5] Payment of taxes commenced with the redemption of tax certificates in 1939 and 1940.
[6] 1 Fla.Jur. Adverse Possession § 6.
[7] Note 1 supra.
[8] Vol. 2, Revised General Statutes of Florida (1920), § 2936(1): "To be land in actual occupancy only  Where it shall appear that there has been an actual occupancy for seven years of premises under a claim of title exclusive of any other right, but not founded upon a written instrument or a judgment or a decree, the premises so actually occupied and no other shall be deemed to have been held adversely."
[9] Vol. 2, Revised General Statutes of Florida (1920), § 2936(2): "Definition of occupancy and possession required  For the purposes of constituting an adverse possession by a person claiming title not founded upon a written instrument, judgment or decree, land shall be deemed to have been possessed and occupied in the following cases only: 1) where it has been protected by a substantial enclosure; or 2) where it has been unusually cultivated or improved."
[10] Osceola Fertilizer Co. v. Beville, 86 Fla. 479, 98 So. 354 (1923).
[11] Laws of Florida (1939) c. 19254, § 1.
[12] Addis v. Hoagland, 150 Fla. 694, 8 So.2d 655 (Fla. 1942); Polk v. Kelley, 184 So.2d 494 (2 Fla.App. 1966); McKinnon v. Commerford, 88 So.2d 753 (Fla. 1956); Grove City Realty Corp. v. Cole, 208 So.2d 275 (2 Fla. App. 1968); and Boyer, Florida Real Estate Transactions, Vol. 2, § 29.15.